**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EARL LLOYD JACKSON,
   *Petitioner-Appellee,*

v.

JILL BROWN, Warden, Acting
Warden, California State Prison at
San Quentin,
   *Respondent-Appellant.*

No. 04-99006

D.C. No.
CV-95-03286-ER

EARL LLOYD JACKSON,
   *Petitioner-Appellant,*

v.

JILL BROWN, Warden, Acting
Warden, California State Prison at
San Quentin,
   *Respondent-Appellee.*

No. 04-99007

D.C. No.
CV-95-03286-ER

OPINION

Appeal from the United States District Court
for the Central District of California
Edward Rafeedie, District Judge, Presiding

Argued and Submitted
December 7, 2006—Pasadena, California

Filed January 23, 2008

Before: Kim McLane Wardlaw, Richard A. Paez, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Wardlaw

885

## COUNSEL

Tracy J. Dressner, La Crescenta, California, and Jay L. Lichtman, Los Angeles, California, for the petitioner-appellee/cross-appellant.

Bill Lockyer, Attorney General; Robert R. Anderson, Chief Assistant Attorney General; Pamela C. Hamanaka, Senior Assistant Attorney General; Scott A. Taryle, Deputy Attorney General; Kyle S. Brodie, Deputy Attorney General; and Susan Lee Frierson, Deputy Attorney General, Los Angeles, California, for the respondent-appellant/cross-appellee.

## OPINION

WARDLAW, Circuit Judge:

Earl Jackson petitions for a writ of habeas corpus challenging (1) his state court convictions for two counts of burglary and two counts of murder, (2) the jury's findings of special

circumstances making him death-eligible, and (3) his ultimate death sentence. The district court denied relief as to his convictions, but granted conditional relief as to the special circumstances findings and the death sentence.[1] Warden Brown (the "State") does not appeal the district court's judgment as to the death sentence itself, but appeals the relief granted as to the special circumstances findings.[2] Jackson cross-appeals the district court's denial of relief as to the underlying convictions. We affirm the district court's partial grant of Jackson's petition as to the special circumstances and death sentence and its partial denial as to his convictions.

## I.  BACKGROUND

### A.  *The Crimes of Conviction*

In 1977, two elderly widows—neighbors in the same apartment building in Long Beach, California—were beaten to death during burglaries of their residences. Vernita Curtis, eighty-one, was found lying unconscious on her bedroom floor on August 29, 1977. Her face was swollen and severely bruised. She had suffered multiple injuries to her head, neck, and chest, and died in the hospital four days later. Less than two weeks later, her next door neighbor, Gladys Ott, ninety, was found dead in her bed. The injuries suffered by Ott were even more severe, and included bruises on her face, broken ribs, a fractured sternum, a detached lung, and extensive lacerations to her vagina. Various household items were missing

---

[1]The district court's conditional grant gives the State of California 120 days from the entry of judgment to either retry Jackson as to the special circumstances findings or vacate the special circumstances findings and death sentence. Judgment was entered but stayed pending this appeal.

[2]If the district court judgment stands, Jackson cannot be re-sentenced to death unless the Los Angeles District Attorney's Office first retries Jackson as to both the special circumstances and the death sentence. If we were to reverse the district court as to the special circumstances finding, Jackson could be sentenced to death after only a penalty phase retrial, without re-litigating the special circumstances that rendered him death-eligible.

from both apartments, and Ott's apartment had been ransacked.

Jackson was sought for questioning after his fingerprints were found in Ott's apartment. He turned himself in to the police and gave two recorded statements. In the initial round of questioning, Jackson denied any participation in the crime. Instead, he said he was weightlifting on a nearby balcony and saw someone walking around looking at the neighborhood houses. He went for a walk later that evening and passed Ott's front door. He told the police: "the lady's door was open so I just you know, opened the door, walked in. When I walked in the lady was laying in bed. I seen the bottle and I touched it you know."

Jackson subsequently recanted and confessed to his involvement in the burglaries that led to the two murders. He said he had a number of accomplices with whom he had broken into the apartments seeking money. He entered Ott's apartment at night through a kitchen window and unlocked the front door for his accomplices. He claimed their purpose was "[t]o find money. That's all." When Ott awoke, one of Jackson's accomplices punched her in the jaw, apparently knocking her unconscious. Jackson admitted to "grabb[ing] her two or three times" and asking her where her money was. Jackson also said, "I think I hit her once, just once." He described taking a television, a vacuum cleaner, and a toaster.

Jackson also described the Curtis burglary. He attributed the idea to one of his accomplices, Elton Boyd, who was later convicted for his participation in Curtis's murder. Jackson claimed that he did not know Curtis was in the apartment asleep and that she had woken up in the middle of the burglary. Boyd grabbed Curtis and told Jackson to hold her. Jackson complied, believing that Boyd was only planning to tie her up, but Boyd instead started to hit her. Boyd's actions "kind of shocked [Jackson]. He hit her so quick. It happened so fast." Jackson "didn't know that [Boyd] was trying to kill

her or nothing." He did not find out that Curtis had died until a few days later.

## B. *The Trial*

Jackson was charged with two counts of first-degree murder and two counts of burglary. He was represented by Theodore Veganes, a court-appointed defense attorney. The case was prosecuted by Paul Marin, a Los Angeles County deputy district attorney from Long Beach.

At trial, the prosecution presented Jackson's taped confession, along with the testimony of several other witnesses tying him to the crimes. Al Rivera, an identification officer with the Long Beach police, testified that he had matched a number of Jackson's fingerprints to the prints lifted at Ott's apartment.

Nathaniel Johnson, an older gentlemen who was familiar with Jackson, testified that he convinced Jackson to turn himself in to the police. According to Johnson, Jackson said that "[t]hey looking for me on a murder rap which I didn't do." Jackson apparently told Johnson that he knew that "four or five" people were involved in the murder and claimed the police would never know who was involved unless he told them.

One witness, Ilena Gaines, testified that she lived in an apartment upstairs from Curtis and saw Jackson outside the apartment building when the paramedics removed Curtis from the building. According to Gaines, when Jackson saw Curtis, he "smiled" and "laughed" and "said that he was the one who did that." On cross-examination, however, Gaines admitted that Elton Boyd, Jackson's alleged accomplice, was her boyfriend and the father of one of her children. She admitted that Boyd had himself been convicted for Curtis's murder and that he blamed Jackson for "say[ing] he beat the old lady up when he didn't." Finally, Gaines admitted that she had only come forward with her description of Jackson's statements and

actions after Boyd's arrest, even though she had previously been questioned about the Curtis killing.

The prosecution read to the jury the testimony of two unavailable witnesses who had previously testified at the preliminary hearing. The first was Larry Rushing, a fugitive who claimed to know Jackson "from the streets." Rushing stated that in August 1977, Jackson told him that he had "ripped off the house downstairs" and "said something about he had hit the old lady." Rushing had also seen Jackson try to enter one of the apartments when the "lady left to go to the church." On redirect, he said Jackson told him "that the old lady had messed around and walked in on him and he hit her."

The second unavailable witness was Debria Lewis, a woman acquainted with Jackson. Her preliminary hearing testimony was read at trial and described a conversation with Jackson on the evening of September 11, 1977. According to Lewis, Jackson "was looking in the evening paper and he saw the article there of Curtis, the 83-year-old woman. And he said, 'This is what I done.'" Jackson further said that "if she had just been still—she had been still and given him the money, that she would have been walking around today." Lewis spoke with the police on September 13, 1977, describing her conversation with Jackson. In this discussion with the police, Lewis attributed statements to Jackson that "he and his partners had planned what they were going to do for a couple of weeks but one of them messed up" and also that "if she had been still, she would not have been choked to death."

Debra Ann Hall, Jackson's cousin, testified that she talked to Jackson on September 11, 1977 at Debria Lewis's apartment. Hall claimed that he pointed out a newspaper article about the deaths of Curtis and Ott and said something to the substance of "this is what I did." Jackson also told Hall that he did it because "he needed some money."

Finally, the State presented two inmates who claimed to have met Jackson in jail. Ronald McFarland testified to a conversation with Jackson in October 1977:

> Well, we talked about his case. He was telling me about his case, about the murder case; that he killed an older, aged woman in Long Beach here, and he told me that him and three of his buddies—one stayed outside and him and the other two went into the side kitchen window of her house and they started ransacking her house and then the lady came out of her bedroom. And Jackson said he seen her and pushed her back onto the bed and started beating her, and then they continued to ransacking. And then the old lady woke up and started hollering and Jackson started beating her and then she was unconscious. This is what he told me.
>
> And then he said he seen a wine bottle or long-necked bottle of some kind and stuck it into her vagina.

On redirect, prosecutor Marin queried, "And is it true that no one promised you anything in exchange for your testimony against Mr. Jackson?" McFarland responded, "Yes, that's right."

Another co-prisoner, Mark Mikles, claimed to have had several conversations with Jackson. According to Mikles, a group of inmates were "woofing at Jackson about his cases, you know, trying to make him into a tough guy because he had a couple of 187's." He recounted:

> So, one guy told him—he says "Come on, man, you know you killed those two old ladies.
>
> And at first he said "Na, na, that ain't me man."

And they woofed at him for a little while, you know. "You are out there doing it up real big." He says, "You know you killed those two old dudes."

In the crowd—it was a little group over in a corner. He said, "So what if I did kill those two old bitches, those two old white bitches?"

Mikles went on to describe a one-on-one conversation with Jackson:

I said, "You had a couple of hot murder cases, a couple of 187's?"

He said, "Yeah."

I says, "How did you pick up a couple—a couple of murders in a robbery or something?"

He said, "No. I had a burglary."

I tell him, "How did you turn a burglary into a robbery"—excuse me—"a burglary into a murder?"

He said, "Oh, a couple of—me and a couple of my partners, you know, we were out going to do this burglary in this apartment complex and we all went in and we were ransacking the house."

He was in—he was in the living room, wrapping up the TV. I remember him telling me something about wrapping up a TV wire or something like that, and this old lady comes up in the hallway, and I guess he caught her attention or something, you know, or she might have made some noise. I can't really remember what cause his attention about it, you know. I can't foresee anything catching my attention when I am ransacking a house, but he went

over and hit her a couple of times, and I guess she was backing up into the bedroom, and he kept firing on her until she—he knocked her out on the bed.

. . . So he is going—he is in the bedroom, and the lady is making noise. She is waking up. She is screaming or something, so he beats on her a couple of more times, you know. How many times I really couldn't say, till he knocked—till what it appeared, he knocked her out again. She fell down on the bed. . . .

. . . .

He told me, when she got up the second time instead of, instead of her sitting there and being cool, she started screaming and making a lot of noise.

. . . .

I asked him the question, you know, "Why, you know, because she was, you know—she was so old —why pounce on her so much?"

And he said that when she woke up, you know, he just went off. It just pissed him off so bad, because—because he sick—he beat her on the point, when he knocked her out again, he told me that he was so hot at her that there was a bottle on the stand next to the bed and he took the bottle and he fucked her in her pussy with it, his exact words he told me.

On cross examination, defense attorney Veganes tried to impeach Mikles with his convictions for armed robbery, for which he was still awaiting sentencing. In particular, Veganes asked Mikles about his contact with the police:

Q   When did you go to the police pursuant to this information that you just told us about?

A   I believe it was around the end of March.

Q   You know about this from February and before, and you decided to go to the police at the end of March; is that correct?

A   Yes.

Q   And why did you go to the police at that particular time?

A   Because the police were sent to me by other police?

. . . .

Q   The police were sent to you?

A   Yeah.

Q   By other police?

A   Right.

Q   And those are the police that are holding your case in Norwalk?

A   No.

. . . .

Q   And you were still awaiting sentence on this offense and still awaiting sentence in Norwalk; is that correct?

A   I am not sure about my cases here. I can't remember if I had already been sentenced or not.

Q    Don't you have an extreme desire that the cases
     in Norwalk be sentenced—or be sentenced con-
     current with the time that you are doing here in
     the Long Beach cases?

. . . .

A    Yeah, it has been decided since March that is
     exactly what is going to happen in those cases.

Q    That is what you would like to happen?

A    That is what I know is going to happen. It is part
     of the plea bargain.

Q    You know what is going to happen in Norwalk
     before you are even sentenced?

A    Yeah.

Q    And the time you are doing on this case you are
     going to credit for the four counts of robbery
     you are doing in Norwalk?

A    To be run concurrent.

On redirect, Mikles testified that he did not tell the police
about Jackson's statements until after he had entered into the
plea bargain in Norwalk. Prosecutor Marin then questioned
Mikles further about his police interactions:

Q    All right. Now did anyone, up to the time that
     you have testified now on this witness stand—
     did anyone—when I say "anyone," I include
     sheriffs, police, District Attorneys; in other
     words, anyone in law enforcement—did anyone
     —probation officers—did anyone promise you

anything in exchange for your testifying about the conversation that Jackson had with you?

A  Just a lot of protection.

Q  Pardon?

A  Just a lot of protection.

Q  Just a lot of protection?

A  Yeah

Q  Is that about all?

A  That's it.

Q  And who, incidentally, promised you protection?

A  The Sheriff's Department did.

In addition to these witnesses tying Jackson to the crime, the prosecution presented several witnesses who testified to the general circumstances in which the bodies were found. Manuel Breton, a deputy medical examiner at the Los Angeles County Coroner's office, described Ott's injuries in detail. He testified that all of Ott's injuries, except those to the vagina, were caused by blunt force trauma, like a fist or the wall, and that at least eight to ten blows would have been required to cause the injuries. He further opined that the vaginal injuries were caused by the insertion of a foreign object. Marin asked, "Caused by a bottle?" and Breton testified, "Yes, it could have been." Finally, he testified that the cause of Ott's death was asphyxiation by manual strangulation.

**C.** *The Special Circumstances Findings and the Death Penalty*

On January 5, 1979, Jackson was convicted on both counts of first-degree murder and both counts of burglary.

Under the 1977 California death penalty statute, at least one "special circumstance" finding was required for a defendant to qualify for a sentence of death or life without parole. Cal. Penal Code § 190.2 (1977). The jury found two special circumstances rendering Jackson death-eligible: (1) that Ott's murder was willful, deliberate, and premeditated and was committed during the commission of a burglary ("murder during the commission of a burglary"), and (2) that Jackson had in this proceeding been convicted of more than one offense of murder ("multiple murder"). Each of these special circumstances findings required that "[t]he defendant was personally present during the commission of the act or acts causing death, and *with the intent to cause death* physically aided or committed such act or acts causing death." *Id.* § 190.2 (emphasis added).

In the separate penalty phase of the trial, the jury returned a verdict of death for Ott's murder. Jackson received a life sentence for Curtis's murder and four-year sentences for each burglary, all to run concurrently.

**D.** *Post-conviction proceedings*

On automatic appeal to the California Supreme Court, Jackson challenged the constitutionality of the state's 1977 death penalty statute and raised various other claims of error.[3]

---

[3]Jackson argued that much of the evidence used against him was inadmissible, including his confession, *People v. Jackson*, 28 Cal. 3d at 297; photographs of Curtis's corpse, *id.* at 302; evidence of Ott's sexual assault, *id.* at 303; Ilena Gaines's testimony about Elton Boyd's statements, *id.* at 306; and the preliminary hearing testimony of Larry Rushing and Debria

*People v. Jackson*, 28 Cal. 3d 264 (1980). Jackson simultaneously petitioned the California Supreme Court for a writ of habeas corpus based on ineffective assistance of counsel.[4] *Id.* at 282. On October 23, 1980, in a 4-3 decision, the court issued a consolidated opinion affirming the judgment and denying Jackson's habeas petition. *Id.* at 282. On March 30, 1981, the United States Supreme Court denied Jackson's petition for writ of certiorari. *Jackson v. California*, 450 U.S. 1035 (1981).

On August 10, 1981, Jackson filed a second habeas petition in the California Supreme Court, alleging, among other things, that the prosecution had suppressed evidence that Mikles and McFarland had been induced to testify against Jackson. The court issued an order to show cause and appointed the Honorable Bernard S. Jefferson, Retired Presiding Justice of the California Court of Appeal, to serve as a referee in a special reference proceeding. Justice Jefferson was directed to make findings on three issues:

---

Lewis, *id.* at 311. He also asserted that the trial court erred by denying his pretrial motion to appoint a second attorney to assist in his defense, *id.* at 285; declining to give jury instructions for manslaughter, *id.* at 305; conducting a hearing on his motion for mistrial outside of his presence, *id.* at 308; excluding Mikles's prior federal conviction for impeachment purposes, *id.* at 311; excluding four prospective jurors who declared they would not impose the death penalty, *id.* at 313; and allowing his defense attorney to rest without presenting any mitigating evidence during the penalty phase without an explicit waiver by Jackson, *id.* at 313-14. Finally, Jackson argued that the prosecutor committed misconduct by impermissibly commenting on his courtroom demeanor, *id.* at 304, and by failing to disclose Mikles and McFarland as potential witnesses until shortly before trial, *id.* at 307.

[4]Jackson argued that his attorney was ineffective at the guilt phase for failing to: "(1) investigate the case in a properly and timely manner; (2) present a diminished capacity defense at trial; (3) object to certain adverse evidence; and (4) deny defendant's guilt during closing argument to the jury." *People v. Jackson*, 28 Cal. 3d at 288. Jackson also claimed ineffective assistance at the penalty phase based on his counsel's failure to present any mitigating evidence. *Id.* at 293.

> (1) whether the admissions defendant made to two jailhouse informants, Mark Mikles and Ronald McFarland, deliberately were elicited from defendant at the behest of law enforcement officials so as to render the statements inadmissible at trial . . . ; (2) whether the prosecution improperly failed to disclose to the defense any inducements offered by state agents to Mikles or McFarland for their testimony at defendant's trial; and (3) whether defendant's trial counsel failed to provide adequate representation with respect to the special circumstance allegations or the penalty phase of the trial.

*In re Jackson*, 3 Cal. 4th 578, 584 (1992).

On August 16, 1988, after taking testimony from eighteen witnesses and receiving into evidence twenty-seven exhibits, Justice Jefferson issued his first report, which made findings as to the first and third questions. First, the referee found that Mikles and McFarland had not impermissibly elicited Jackson's statements at the behest of law enforcement. However, he concluded that Jackson was denied effective assistance of counsel at both the guilt and penalty phases of the trial. In the penalty phase, defense attorney Veganes presented no evidence on Jackson's behalf and only interviewed three potential witnesses: Jackson's father, grandmother, and aunt. Justice Jefferson found that there were many other relatives who could have provided mitigating evidence, including evidence of "unconscionable" "physical and psychological abuse" in Jackson's childhood. Because the decision not to call any mitigating witnesses was based on Veganes's misunderstanding of the scope of rebuttal evidence, it could not be considered a reasonable tactical decision. Similarly, at the guilt phase, Veganes completely failed to investigate the background of either Mikles or McFarland, despite his belief that "the testimony of those two witnesses" was "the guts of the Jackson case." Had Veganes performed any investigation of these jailhouse informants, he would have discovered that

Mikles was a former member of the Aryan brotherhood, that Mikles and McFarland had each been offered governmental assistance in exchange for testifying, and that the two witnesses had been in contact in jail and had the opportunity to collaborate to ensure consistency in their testimony. The referee concluded that these witnesses' testimony was crucial to the jury's finding that Jackson committed the crime "with the intent to cause death"; accordingly, Veganes's ineffective assistance prejudiced both the jury's special circumstances findings and the jury's death verdict, although it did not affect the underlying convictions.

On September 21, 1989, Justice Jefferson issued a supplemental report addressing the undisclosed inducements made to Mikles and McFarland. He found that law enforcement officers had promised Mikles that they would help him get a pending six-year sentence reduced, as little time as possible in an upcoming sentencing, and a pending parole violation sentence reduced, although they did not promise any specific results. Prosecutor Marin offered to write a letter to prison authorities on McFarland's behalf to help him serve his time in Arizona, where his family lived. None of these inducements was disclosed at trial; in fact, both witnesses falsely testified that they had received no promises in exchange for their testimony, other than the "protection" described by Mikles. Justice Jefferson concluded:

> This was a clear case of concealment and a failure by the prosecution to disclose to petitioner Jackson's lawyer, the inducements made to Mikles and McFarland. The disclosure to the jury of these inducements could well have caused the Jackson jury to give little or no credence to the damaging testimony of Mikles and McFarland.

The California Supreme Court reviewed Justice Jefferson's reports and issued an opinion on August 31, 1992. *In re Jackson*, 3 Cal. 4th 578 (1992). The court agreed with the referee

that the prosecution improperly failed to disclose the promises of assistance to Mikles and McFarland and that it failed to correct the perjured testimony concerning these promises. *Id.* at 594-97 ("Accordingly, we conclude that because the prosecution should have known of the false and misleading nature of the informants' testimony, the prosecution was under a constitutional obligation to correct that testimony."). However, the court concluded, in a 5-2 decision, that these constitutional errors were not prejudicial because Jackson had admitted to hitting Ott, and, at that time, Jackson knew that Curtis had recently died from a similar beating. *Id.* at 598-99. Therefore, "although defendant did not admit . . . that he acted with the intent to cause Mrs. Ott's death," his statement "went a long way toward proving the elements of the special circumstances finding." *Id.* at 599. Moreover, the court pointed to the testimony of other witnesses and the statements they attributed to Jackson that "clearly established that defendant had the requisite culpability." *Id.* For example, Jackson apparently referred to the victims as " 'two old bags [who] were a nuisance and . . . *got what they deserved*,' " *id.* (emphasis and alteration in original), and stated that " '[t]his is what *I* did, that it was because *I* needed some money,' " *id.* (emphasis in original). Accordingly, the court found that the errors did not justify habeas relief as to either the special circumstances findings or the death sentence. *Id.* at 599, 600. For the same reasons, the court held that even if Veganes's failure to investigate Mikles and McFarland was deficient, this deficiency did not prejudice the special circumstances findings so as to constitute ineffective assistance of counsel under the Sixth Amendment. *Id.* at 604-05. Finally, the court agreed with Justice Jefferson that Veganes's failure to investigate potential mitigating evidence at the penalty phase was deficient performance; however, it disagreed with the referee's conclusion that Jackson suffered prejudice. *Id.* at 615.

Jackson filed his first federal habeas petition on April 1, 1996. Because it alleged unexhausted claims, it was stayed until Jackson exhausted his remedies in state court. On Sep-

tember 9, 1996, Jackson filed a third habeas petition in the California Supreme Court, claiming, among other things, that the prosecutor impermissibly failed to disclose Mikles's psychiatric reports. On February 23, 2000, the California Supreme Court denied this third petition on the merits and on various procedural grounds.

On March 31, 2000, Jackson filed an amended petition for writ of habeas corpus in the federal district court. Agreeing with Justice Jefferson's reports, the district court found that "the suppressed impeachment evidence was so extensive and damning that if the jurors had heard it, Mikles's and McFarland's credibility would have been irreparably harmed, and jurors would have given little or no credence to their testimony." The district court agreed with the California Supreme Court that the prosecutor's errors did not undermine the convictions; however, it found that the jailhouse informants' testimony was central to the finding that Jackson acted with the intent to cause death and therefore required overturning both the jury's special circumstances findings and the death sentence. The district court, like the referee, also concluded that Jackson had been denied ineffective assistance of counsel by Veganes's failure to investigate Mikles and McFarland at the guilt phase and by his failure to present mitigating evidence at the penalty phase. Accordingly, the district court granted Jackson's petition as to both the special circumstances findings and the death sentence, but not as to the underlying convictions. The parties timely appealed the district court's judgment.

The State does not contest the district court's order vacating the sentence of death; however, it challenges the grant of relief as to the special circumstances findings. First, it argues that the district court's legal findings of prosecutorial error relied on "new rules" of criminal procedure and hence were barred by *Teague v. Lane*, 489 U.S. 288 (1989). Second, it argues that even if these findings of prosecutorial error were not *Teague*-barred, the undisclosed offers and promises were

immaterial and any prosecutorial error was harmless. Third, it argues that Jackson's claim regarding the undisclosed psychiatric reports was procedurally defaulted, and that, either way, the failure to disclose did not constitute reversible error. Finally, the State contends that trial counsel's failure to investigate Mikles and McFarland was not deficient and, in any event, was not prejudicial.

Jackson cross-appeals the partial denial of relief as to his convictions. The district court heard numerous claims challenging the convictions but granted a certificate of appealability only as to whether (1) Jackson's defense counsel's repeated racially derogatory remarks during trial deprived him of a fair trial; (2) defense counsel impermissibly compelled him to stand trial in jail clothing despite his desire to wear civilian apparel; (3) the trial court erred in admitting irrelevant and highly prejudicial evidence of Ott's sexual assault and his defense attorney was ineffective in failing to object to this evidence; (4) the introduction of prerecorded testimony by Larry Rushing and Debria Lewis violated his Sixth Amendment right to confrontation; and (5) the cumulative effect of these errors rendered his trial fundamentally unfair.

## II.  STANDARD OF REVIEW

Because Jackson's federal petition for writ of habeas corpus was filed before the effective date of the Anti-Terrorism and Effective Death Penalty Act (AEDPA), the general AEDPA provisions are inapplicable. *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997). However, the certificate of appealability requirements of AEDPA do apply, *Slack v. McDaniel*, 529 U.S. 473, 481-82 (2000); therefore, Jackson's appeal is limited to those claims that the district court certified for appeal. 28 U.S.C. § 2253(c).[5]

---

[5]We did not expand the certificate of appealability to include issues that the district court declined to certify.

We review the district court's decision to grant habeas relief de novo. *Alcala v. Woodfood*, 334 F.3d 862, 868 (9th Cir. 2003). We review de novo questions of law and mixed questions of law and fact, whether decided by the district court or the state courts. *Hovey v. Ayers*, 458 F.3d 892, 900 (9th Cir. 2006); *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002); *Williams v. Taylor*, 529 U.S. 362, 400 (2000) (O'Connor, J., concurring) ("[Pre-AEDPA], a federal habeas court owed no deference to a state court's resolution of such questions of law or mixed questions."). The district court's factual findings are reviewed for clear error. We therefore accept its findings "absent a definite and firm conviction that a mistake has been committed." *Hovey*, 458 F.3d at 900 (internal quotation marks omitted). State court factual findings are entitled to a presumption of correctness, subject to eight exceptions enumerated in the previous version of 28 U.S.C. § 2254(d). *Palmer v. Estelle*, 985 F.2d 456, 458 (9th Cir. 1993).[6]

---

[6]The pre-AEDPA version of 28 U.S.C. § 2254(d) applied the presumption of correctness, "unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit":

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, perti-

Habeas relief is usually warranted only if the alleged constitutional errors had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks omitted). However, certain types of claims are analyzed under their own harmless error standards, which can render *Brecht* analysis unnecessary. *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 435 (1995) (noting that *Brecht* analysis is unnecessary for *Brady* claims made on habeas); *Hayes v. Brown*, 399 F.3d 972, 984-85 (9th Cir. 2005) (en banc) (same for *Napue* claims).

## III.   THE STATE'S APPEAL

We agree with the district court and the California Supreme Court that the prosecution suppressed information favorable to the defense in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and knowingly failed to correct false testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). Moreover, the district court correctly concluded that "the suppressed impeachment evidence was so extensive and damning that if the jurors had heard it, Mikles's and McFarland's credibility would have been irreparably impaired." Further, we agree with both the district court and state court referee Justice Jefferson that the testimony of these jailhouse informants was material to the jury's finding that Jackson acted "with the intent to cause death." Therefore, these *Brady* and *Napue* errors entitle Jackson to habeas relief with respect to the jury's special circumstances findings and the resulting sentence of death. Accordingly, we need not reach the question whether Jackson's defense attorney's failure to investigate

---

nent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record.

28 U.S.C. § 2254(d) (1994).

Mikles and McFarland constituted ineffective assistance of counsel.

The district court correctly held the prosecution accountable for four distinct *Brady* and *Napue* errors. First, the prosecutor failed to disclose that he had promised to write a letter on McFarland's behalf recommending that he be allowed to serve his sentence in Arizona, where his family lived, rather than in California. Second, the prosecutor failed to correct McFarland's perjured testimony stating that he had received no inducements to testify. Third, the prosecutor failed to disclose that, in exchange for Mikles's testimony, law enforcement officers had promised to help him obtain a reduction in his current sentence and receive lower sentences in his pending cases. Finally, the prosecutor failed to correct Mikles's perjured testimony regarding these promises.[7]

## A. *Prosecution's failure to disclose promises made to McFarland*

[1] The district court found, and the State concedes, that Deputy District Attorney Marin promised McFarland he would write a letter on McFarland's behalf recommending that he be allowed to serve his California prison sentence in Arizona near his family in exchange for his cooperation in Jackson's trial. The State further concedes that this promise was not disclosed to the defense. The district court concluded that the failure to disclose the prosecution's promise was *Brady* error.

[2] In *Brady v. Maryland*, 373 U.S. 83 (1963), the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process

---

[7]The district court also found that the prosecutor had improperly failed to disclose psychiatric reports that revealed Mikles's drug abuse and psychological disorders. We need not reach this claim because it is unnecessary to our holding.

where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. There are three essential components to a *Brady* claim: (1) "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching," (2) "that evidence must have been suppressed by the State," and (3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

**[3]** Here, there is no doubt that the first two elements are met. The undisclosed promise was relevant to impeach McFarland's credibility and therefore was favorable to Jackson. *See id.* Moreover, the prosecution's offer was not disclosed to the defense, so it is deemed suppressed. *See Benn v. Lambert*, 283 F.3d 1040, 1053 (9th Cir. 2002) ("[T]he terms 'suppression,' 'withholding,' and 'failure to disclose' have the same meaning for *Brady* purposes."). All that remains, therefore, is to determine whether Jackson suffered prejudice as a result of the prosecution's failures to comply with its constitutional obligations.

To determine whether prejudice exists, we look to the materiality of the suppressed evidence. *Hovey v. Ayers*, 458 F.3d 892, 916 (9th Cir. 2006). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). We may find a "reasonable probability" even where the remaining evidence would have been sufficient to convict the defendant. *Strickler*, 527 U.S. at 290. Moreover, we may find a "reasonable probability" without finding that the outcome would more likely than not have been different. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Instead, "[a] 'reasonable probability' of a different result [exists] when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Id.* (quoting *Bagley*, 473 U.S. at 678).

The materiality of suppressed evidence is "considered collectively, not item by item." *Kyles*, 514 U.S. at 436. Here,

Jackson asserts numerous *Brady* and *Napue* violations. Therefore, rather than analyze whether the failure to disclose Marin's promise was material on its own, "[w]e evaluate . . . [the] cumulative effect [of the prosecutorial errors] for purposes of materiality separately and at the end of the discussion." *Id.* at 436 n.10.

**B.** *Subornation of perjury and failure to correct McFarland's false testimony*

**[4]** At trial, Marin asked McFarland, "And is it true that no one promised you anything in exchange for your testimony against Mr. Jackson?" McFarland answered, "Yes, that's right." In light of Marin's promise to help McFarland serve out his sentence closer to his family, this testimony was false. Moreover, Marin knew that the testimony was false because he himself had made the promise; nevertheless, he failed to correct the perjury.

**[5]** The Supreme Court has long held that a conviction obtained using knowingly perjured testimony violates due process. *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). In *Napue v. Illinois*, 360 U.S. 264 (1959), the Court made clear that this prohibition against the use of false testimony applies even when the testimony in question was relevant only to the witness's credibility. *Id.* at 269. A claim under *Napue* will succeed when "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material." *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (internal quotation marks and alteration omitted). Again, the first two elements are undoubtedly met here, so the only question is whether McFarland's perjured testimony was material.

**[6]** As in the *Brady* context, the basic question is " 'whether . . . [the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence.' " *Hall v. Dir. of*

*Corr.*, 343 F.3d 976, 983-84 (9th Cir. 2003) (per curiam) (considering a *Napue* claim) (quoting *Kyles*, 514 U.S. at 434 (considering a *Brady* claim)). Because each additional *Napue* and *Brady* violation further undermines our confidence in the decision-making process, we analyze the claims "collectively," *Kyles*, 514 U.S. at 436, and proceed to consider the other asserted prosecutorial violations.

### C. *Prosecution's failure to disclose promises made to Mikles*

**[7]** The California Supreme Court and the district court each found that Mikles was provided significant inducements in exchange for his testimony against Jackson. *In re Jackson*, 3 Cal. 4th 578, 592-93 (1992). The state court referee found that when Mikles first approached the sheriff's and police departments, he conditioned his cooperation on assistance in "(1) having a six-year sentence, previously imposed on him in Long Beach, recalled and reduced, (2) receiving as little time, or, if possible, no time, on a number of charges then pending against him in Norwalk, and (3) having a potential forty-two-month sentence for a federal parole violation reduced or eliminated." *Id.* at 592. In return, members of the sheriff's and police departments promised that "they would bring his cooperation to the attention of the judges and deputy district attorneys involved in his cases and use their best efforts to help him achieve his objectives," although they could not guarantee any specific results. *Id.* After Mikles's testimony, these officers kept their promises and made numerous favorable statements on behalf of Mikles in proceedings against him. *Id.* at 593. In the end, Mikles received everything that he had requested: He was released from his six-year sentence, his parole hold was lifted, fifteen pending charges against him were dropped entirely, and he received a probationary sentence with no time in custody on a pending armed robbery conviction. *Id.*

**[8]** The State concedes that these inducements were offered and that they were not disclosed to the defense, but claims

that the prosecutor was never made aware of them. The Supreme Court has made abundantly clear, however, that the prosecutor's duty to disclose evidence favorable to the accused extends to information known only to the police. *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). Nevertheless, the State argues that *Kyles*'s holding in 1995 created a new rule of criminal procedure and that *Teague v. Lane*, 489 U.S. 288 (1989), prohibits its application to this case.

*Teague* stands for the proposition that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Id.* at 310. "Under the *Teague* framework, an old rule applies both on direct and collateral review, but a new rule is generally applicable only to cases that are still on direct review." *Whorton v. Bockting*, 127 S. Ct. 1173, 1180 (2007). *Teague* explains how we determine whether a "new" constitutional rule of criminal procedure is inapplicable to a given case:

> First, the court must determine when the defendant's conviction became final. Second, it must ascertain the "legal landscape as it then existed," and ask whether the Constitution, as interpreted by the precedent then existing, compels the rule. That is, the court must decide whether the rule is actually "new." Finally, if the rule is new, the court must consider whether it falls within either of the two exceptions to nonretroactivity.

*Beard v. Banks*, 542 U.S. 406, 411 (2004) (citations omitted). Jackson's case became final on direct appeal when the United States Supreme Court denied his petition for a writ of certiorari on March 30, 1981. *Jackson v. California*, 450 U.S. 1035 (1981). Thus, we must examine the legal landscape as of that date "to determine whether existing precedent compelled a finding that the rule[s] at issue '[were] required by the Constitution.' " *Hayes v. Brown*, 399 F.3d 972, 983 (9th Cir. 2005)

(en banc) (quoting *Lambrix v. Singletary*, 520 U.S. 518, 527 (1997)).[8]

**[9]** *Kyles* may have been the first Supreme Court case to find a *Brady* violation where the suppressed evidence was known only to the police, but it did not create a new rule of criminal procedure. In *Kyles* itself, the Supreme Court observed that failing to hold the State "accountable . . . for evidence known only to police investigators and not to the prosecutor . . . would . . . amount to a serious change of course from the *Brady* line of cases."[9] 514 U.S. at 438. Indeed, the principle underlying this unexceptional holding dates back, at the latest, to the Supreme Court's decision in *Giglio v. United States*, 405 U.S. 150 (1972).

In *Giglio*, both *Napue* and *Brady* errors were at issue. A federal prosecutor offered immunity to a key witness in return for grand jury and trial testimony. *Id.* at 152. After the witness testified before the grand jury, but before trial, the case was transferred to another prosecutor who was not aware of the immunity agreement. The witness testified for the government at trial, stating that he had not received any promises that he would not be indicted. *Id.* at 151-52. Writing for the Court, Chief Justice Burger found reversible error under *Napue* and *Brady*: "[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman

---

[8]The State urges that in analyzing whether a rule is new, we should consider only Supreme Court cases. We have rejected this argument, as has the Supreme Court. *See Caspari v. Bohlen*, 510 U.S. 383, 395 (1994) ("Constitutional law is not the exclusive province of the federal courts, and in the *Teague* analysis the reasonable views of state courts are entitled to consideration along with those of federal courts."); *Leavitt v. Arave*, 383 F.3d 809, 819 (9th Cir. 2004) ("[W]e have held that circuit court holdings suffice to create a clearly established rule of law under *Teague*.") (quotation omitted).

[9]*Brady*, of course, was decided in 1963, well before Jackson was indicted.

for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government." *Id.* at 154 (citing Restatement (Second) of Agency § 272). *Giglio*'s focus on the responsibility of the prosecutor to investigate all promises made on behalf of the government extends to promises made by the police, who also make any such promises as spokespersons for the government, and for whom the prosecutor bears responsibility.

Subsequent cases between *Giglio* and *Kyles* also make clear that *Kyles*'s holding did not create a new rule of criminal procedure. In 1978, we held that:

> The prosecutor is responsible for the nondisclosure of assurances made to his principal witnesses even if such promises by other government agents were unknown to the prosecutor. Since the investigative officers are part of the prosecution, the taint on the trial is no less if they, rather than the prosecutor, were guilty of nondisclosure.

*United States v. Butler*, 567 F.2d 885, 891 (9th Cir. 1978) (citing *Barbee v. Warden*, 331 F.2d 842, 846 (4th Cir. 1964) (citing *Pyle v. Kansas*, 317 U.S. 213 (1942))). A year later, the Fifth Circuit agreed, echoing the sentiments expressed in *Giglio*, when it held that "[t]he duty [of] disclosure is that of the state, which ordinarily acts through the prosecuting attorney; but if he too is the victim of police suppression of the material information, the state's failure is not on that account excused." *Freeman v. Georgia*, 599 F.2d 65, 69-70 (5th Cir. 1979) (quoting *Barbee*, 331 F.2d at 847). Later, in *United States v. Steel*, 759 F.2d 706 (9th Cir. 1985), we reiterated that "[b]ecause the government was required to furnish all exculpatory evidence under the doctrine of *Brady* . . . , and because investigative officers are part of the prosecution [under] *Butler*, . . . there was indeed a negligent nondisclosure." *Id.* at 714. As in *Butler*, we never suggested that this rule was in any

way novel, and the State has cited not a single case plausibly suggesting the opposite.[10]

Finally, it is instructive that in Jackson's own state habeas proceedings, the California Supreme Court rejected the State's argument that the prosecutor did not have a duty to disclose offers unknown to the prosecutor that were made by the police and sheriff's department. *See In re Jackson*, 3 Cal. 4th 578, 595-96 (1992) (discussing, inter alia, *Brady*, *Giglio*, and *Barbee*). If the California Supreme Court felt compelled to follow such a rule in 1992, three years before *Kyles*, this suggests that the rule had been in existence well before 1995.

**[10]** Therefore, on March 30, 1981, the United States Constitution, as interpreted by *Brady* and *Giglio*, compelled prosecutors to disclose evidence favorable to the accused, even when that evidence was known only to the police and not to the prosecutor. Thus, *Kyles* did not declare a new rule of constitutional criminal procedure and *Teague* does not bar its application.

The prosecution failed to disclose evidence favorable to Jackson, so the first two *Brady* elements are met. Whether prejudice ensued from this suppression will be addressed considering the prosecutorial errors "collectively." *Kyles*, 514 U.S. at 436.

**D.   *Failure to correct Mikles's perjured testimony***

**[11]** At trial, the prosecutor asked Mikles whether "anyone —when I say 'anyone,' I include sheriffs, police, District Attorneys; in other words, anyone in law enforcement—did anyone . . . promise you anything in exchange for your testify-

---

[10]It is also worth mentioning that in *Kyles* itself, the State of Louisiana abandoned this argument altogether and conceded at oral argument that it was " 'held to a disclosure standard based on what all State officers at the time knew.' " 514 U.S. at 438 n.11.

ing about the conversation that Jackson had with you?" Mikles responded, "Just a lot of protection." The record amply demonstrates, however, that Mikles was offered much more than mere "protection." Therefore, we agree with the California Supreme Court and the district court that Mikles's statement was false and misleading.

The State contends that *Napue* did not require the prosecution to correct Mikles's perjury because the prosecutor himself was unaware of the promises made by the police and sheriff's department. Further, it argues that to hold *Napue* applicable in such a case would create a new rule barred by *Teague*.

**[12]** Again, we disagree with the State's analysis. *Napue* applies whenever a prosecution " 'knew or should have known that the testimony was false.' " *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (quoting *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003)). As described above, the prosecutor has a clear *Brady* obligation to investigate whether the police have evidence favorable to the defendant. *Kyles*, 514 U.S. at 438 ("[A]ny argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials."); *Giglio*, 405 U.S. at 154 ("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor."). If the prosecutor has a duty to investigate and disclose favorable evidence known only to the police, he "should know" when a witness testifies falsely about such evidence. Accordingly, we agree with the California Supreme Court's conclusion that "the prosecution should have known of the false and misleading nature of the informants' testimony," and therefore "the prosecution was under a constitutional obligation to correct that testimony." *In re Jackson*, 3 Cal. 4th at 597.

The State's attempt to characterize this fundamental principle as a "new rule" is unavailing. In *Napue* itself, the Supreme Court made clear: "[I]t is established that a conviction obtained through use of false evidence, *known to be such by representatives of the State*, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." 360 U.S. 264, 269 (1959) (emphasis added) (internal citations omitted). Further, in *Giglio*, the Court explicitly found a *Napue* violation when the prosecutor lacked personal knowledge of the perjury. As described above, *Giglio* involved one prosecutor's unknowing failure to correct false testimony that disavowed promises made by another prosecutor. 405 U.S. at 155. The Court emphasized that, "The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government." *Id.* at 154. The Court concluded that "the due process requirements enunciated in *Napue* and the other cases cited earlier require a new trial . . . ." *Id.* at 155. *Napue* and *Giglio* make perfectly clear that the constitutional prohibition on the "knowing" use of perjured testimony applies when *any* of the State's representatives would know the testimony was false.

**[13]** The California Supreme Court correctly concluded that Jackson's prosecutor should have known of Mikles's perjury and had a constitutional obligation to correct the false testimony. *In re Jackson*, 3 Cal. 4th at 597. In 1981, *Napue* and *Giglio* would have compelled the court to come to the same conclusion, so *Teague* is not implicated.

### E.  *Materiality*

**[14]** A jury's finding should be overturned as a result of *Brady* and *Napue* violations if and only if those violations are material.[11] The fundamental question in the materiality analy-

---

[11]Once *Brady* or *Napue* claims are deemed material, there is no need for further harmless error analysis under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Kyles*, 514 U.S. at 436; *Hayes*, 399 F.3d at 984-85.

sis is whether, despite the prosecution's errors, the defendant "received . . . a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434 (1995). Because each additional *Napue* and *Brady* violation further undermines our confidence in the jury's decision, we analyze the errors "collectively." *See id.* at 436.

**[15]** The materiality analysis proceeds differently for *Brady* and *Napue* claims. Whereas a *Brady* violation is material when "there is a reasonable probability that . . . the result of the proceeding *would* have been different," *Bagley*, 473 U.S. at 682 (emphasis added), a *Napue* violation requires that the conviction be set aside whenever there is "*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005) (en banc) (emphasis added) (internal quotation marks omitted).[12] We have gone so far as to say that " 'if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic.' " *Id.* at 978 (quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)). Nonetheless, *Napue* does not create a "*per se* rule of reversal." *Id.* at 984.

Although we must analyze *Brady* and *Napue* violations "collectively," the difference in the materiality standards poses an analytical challenge. The *Napue* and *Brady* errors cannot all be collectively analyzed under *Napue*'s "reasonable likelihood" standard, as that would overweight the *Brady* violations. On the other hand, they cannot be considered in two separate groups, as that would fail to capture their combined

---

[12]This distinction between *Brady* materiality and *Napue* materiality seems to reflect a sentiment that the prosecution's knowing use of perjured testimony will be more likely to affect our confidence in the jury's decision, and hence more likely to violate due process, than will a failure to disclose evidence favorable to the defendant. It likely also acknowledges that every *Napue* claim has an implicit accompanying *Brady* claim: Whenever the prosecution knowingly uses false testimony, it has a *Brady* obligation to disclose that witness's perjury to the defense.

effect on our confidence in the jury's decision. To resolve this conflict, we first consider the *Napue* violations collectively and ask whether there is "any reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Hayes*, 399 F.3d at 985 (emphasis added). If so, habeas relief must be granted. However, if the *Napue* errors are not material standing alone, we consider all of the *Napue* and *Brady* violations collectively and ask whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding *would* have been different." *Bagley*, 473 U.S. at 682 (emphasis added) (internal quotation marks omitted); *United States v. Zuno-Arce*, 25 F. Supp. 2d 1087, 1117 (C.D. Cal. 1998) (applying a two-step materiality analysis to combined *Brady* and *Napue* claims), *aff'd*, 339 F.3d 886 (9th Cir. 2003). At both stages, we must ask whether the defendant "received . . . a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

**[16]** Jackson does not contend that the prosecutorial errors surrounding the informants' testimony undermine the validity of his convictions; instead, he claims, and the district court found, that the *Brady* and *Napue* violations were material with respect to the jury's special circumstances findings. We agree with the district court that Jackson is entitled to habeas relief as to the special circumstances findings. Because we conclude that the *Napue* violations themselves create a "reasonable likelihood that the false testimony could have affected" the jury's findings that Jackson acted with the intent to cause death, we need not separately address the materiality of the *Brady* violations.

The State argues that the *Napue* violations were immaterial, because even if the prosecutor had corrected the false testimony, the truth would have done little to impeach the informants' credibility. First, as to McFarland, the State suggests that the promise to him was made after McFarland initially spoke to the police about Jackson. Moreover, the jury was already presented with some evidence that McFarland's attor-

ney had separately tried to use his cooperation against Jackson to obtain a reduced sentence. Finally, the State points out that the prosecution never argued for a finding that McFarland was credible based on a lack of inducement.

The State underestimates the impeachment value that the prosecutor's correction of McFarland's testimony could have served. Both the district court and the state court referee found that McFarland would likely have been thoroughly discredited. A jury could easily find that McFarland, facing an unknown sentence for a serious crime, would greatly appreciate the chance to serve out his sentence close to his family and hence would find significant value in the prosecutor's promise. Moreover, although the witness had been cross-examined about his own attempts to benefit from his cooperation, evidence of an explicit promise of assistance by the trial prosecutor likely would have carried far greater weight than any speculative benefit McFarland might have thought he could achieve on his own. Moreover, that McFarland was willing to perjure himself in order to cover up prosecutor Marin's promise would surely have called into question the truth of all of his testimony. Finally, even if Marin never reemphasized this fact in his later argument, the false impression that McFarland was a Good Samaritan, volunteering to help the prosecution, had already been made.

We similarly reject the State's arguments that Mikles's revealed perjury would have had little impact on the jury. Although the jury was aware that Mikles had pending robbery charges and it could have speculated that Mikles was cooperating to try to get a better deal, this speculation pales in comparison to the reality that law enforcement officers had actually promised to use their best efforts to get Mikles's then-current sentence reduced, get his then-pending charges dropped, and get his federal parole hold lifted. The facts of these promises, as opposed to juror speculation as to the timing of Mikles's decision to cooperate with the prosecution, would demonstrate to the jury that Mikles was not an altruis-

tic volunteer stepping forward to testify truthfully. Moreover, his obvious willingness to lie under oath to keep the promises secret would cast doubt on his entire testimony.

Although some of the facts presented in Mikles's and McFarland's testimony were corroborated by other witnesses and by the physical evidence, the corroborated facts were extraneous to the critical predicate finding that the acts causing death were committed "with the intent to cause death." Cal. Penal Code § 190.2 (1977). Mikles and McFarland were the *only* two witnesses who testified that Jackson had admitted to personally sexually assaulting and killing Ott. Most of the relevant facts that Mikles and McFarland described were unrelated to Jackson's alleged "intent to kill" and were in fact corroborated by Jackson himself in his admissions to the police. Therefore, the jailhouse informants' ability to regurgitate these corroborated tidbits tells us, at most, that Jackson discussed the crime with them; it tells us nothing about whether Jackson was the primary perpetrator. Correcting the informants' perjury would have shown that each of these witnesses had a strong incentive to lie in order to secure Jackson's conviction. Each would have known that his story would be better received by the trial prosecutor the more it incriminated Jackson. The promises of assistance thus gave both McFarland and Mikles a strong incentive to lie about exactly that part of the testimony that was most crucial to the special circumstances finding that Jackson acted with the "intent to cause death."

The State asserts that the "intent to cause death" predicate could have been inferred from the fact that Ott was strangled and that Jackson had allegedly told Debria Lewis that "[i]f she had been still, she would not have been choked to death." It would read intent into Jackson's alleged statements that "[t]his is what I done" and that the "two old bags were a nuisance and got what they deserved."

We do not disagree that inferences might have been drawn from these statements from which a jury possibly could have

found an "intent to cause death" even without Mikles and McFarland; however, that is not the proper inquiry. Instead, we must ask whether there exists "any reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Hayes*, 399 F.3d at 984 (emphasis added) (internal quotation marks omitted).

In many ways, this case resembles *Hayes*, where we, sitting en banc, granted habeas relief because the prosecution made a secret deal with a key witness and allowed the witness to falsely deny the deal in his testimony. *Id.* at 988. We found materiality, noting that "[w]ithout the [witness's] testimony . . . , an entirely different trial would have occurred." *Id.* at 987. After reiterating that the "[d]eliberate deception of a judge and jury is 'inconsistent with the rudimentary demands of justice,' " *id.* at 978 (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)), we found that the "due process violations ha[d] undermined our confidence in the verdict," *id.* at 988.

Here, Mikles and McFarland were the only witnesses to describe Jackson admitting to personally committing the murders. The special circumstances findings did not require that he actually commit the acts (it was sufficient that he "physically aided" their commission, Cal. Penal Code § 190.2(c) (1977)); nonetheless, it is clear that the jury would be far more likely to find the requisite "intent to cause death" if it believed that Jackson had personally beat on and sexually assaulted Ott than if it believed only that he was present at the scene of the acts. The district court correctly ruled that the remainder of the State's evidence was "consistent with [Jackson's] participation in the attack on Ott, but . . . at best weak evidence that [he] intended to cause her death." As in *Hayes*, without Mikles's and McFarland's testimony "an entirely different trial would have occurred" with regard to the special circumstances findings. 399 F.3d at 987.

[17] Mikles and McFarland were the two key witnesses for the finding of intent to cause death, and, as described above,

the prosecution's solicitation of perjured testimony bolstered their credibility, whereas the truthful testimony would have substantially impeached it. We conclude that there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* at 984 (internal quotation marks omitted). In light of the false testimony, we cannot be sure that the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Hall v. Dir. of Corr.*, 343 F.3d 976, 984 (9th Cir. 2003) (per curiam) (internal quotation marks omitted). Under these circumstances, *Napue* requires that we affirm the district court's partial grant of habeas relief as to the jury's special circumstances findings.

## IV. JACKSON'S CROSS-APPEAL

We, like the district court, having considered each of the claims as to which it granted Jackson a certificate of appealability, conclude Jackson is not entitled to habeas relief as to his underlying convictions. Several of Jackson's claims are *Teague*-barred. The remaining errors, if they occurred at all, are harmless: The evidence supporting Jackson's guilt of the offenses of conviction is overwhelming, so he cannot demonstrate that the alleged errors had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks omitted).

### A. *Counsel's Racist Remarks*

Jackson claims that his defense counsel's repeated racial references and derogatory remarks about Jackson and African Americans impermissibly injected race into the proceeding in violation of his Fourteenth Amendment right to a fair trial. It is true that Veganes made numerous references to race throughout the trial, from voir dire up through his penalty stage closing argument. The district court addressed Jackson's claim only briefly, stating: "Counsel's guilt phase closing

argument, including his racial references, was reasonable under the circumstances."

We need not consider whether Veganes's statements were reasonable, because Jackson's claim depends on an initial, and ultimately fatal, proposition that the acts of a court-appointed defense counsel constitute state action. The Fourteenth Amendment's right to due process only protects discrimination that results from state action. *Shelley v. Kraemer*, 334 U.S. 1, 13 (1948) ("That Amendment erects no shield against merely private conduct, however discriminatory or wrongful."). Because prosecutors are state actors, "[t]he Constitution prohibits racially biased *prosecutorial* arguments." *McClesky v. Kemp*, 481 U.S. 279, 309 n.30 (1987) (emphasis added) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). However, the Supreme Court has held that "a *public defender* does not act under color of state law when performing a lawyer's traditional functions to a defendant in a criminal proceeding." *Polk County v. Dodson*, 454 U.S. 312, 322 n.13, 325 (1981) (emphasis added) (noting that when performing these traditional functions "a public defender is not acting on behalf of the State; he is the State's adversary").[13]

Veganes's contested statements—made during voir dire juror questioning and closing arguments—likely fall within the defense lawyer's "traditional functions"; moreover, even if we were inclined to hold otherwise, *Teague* would prohibit applying such a rule to Jackson's case. *Dodson* was the first Supreme Court case to consider whether public defenders acted under color of state law, and it cast into serious doubt

---

[13]In *Georgia v. McCollum*, the Court created an exception to the general rule set forth in *Dodson*, holding that "a criminal defendant's exercise of a peremptory challenge constitutes state action for purposes of the Equal Protection Clause." 505 U.S. 42, 50 (1992). The Court distinguished *Dodson* by noting that "[i]n exercising a peremptory challenge, a criminal defendant is wielding the power to choose a quintessential governmental body—indeed, the institution of government on which our judicial system depends." *Id.* at 54.

the notion that a court-appointed counsel's derogatory statements could be considered state action under the Fourteenth Amendment. 454 U.S. 312. *Dodson* was decided several months after Jackson's case became final; however, it noted that prior to its decision, the federal circuits were strongly divided on the state action issue. *Id.* at 317 n.4 ("The Courts of Appeals for the Seventh and Eighth Circuits have held that public defenders do act under color of state law in their representation of indigent defendants. The Fifth and the Tenth Circuits have held that they do not. The Third and Ninth Circuits have supported the latter position in dicta . . . ." (internal citations omitted)). In light of the Supreme Court's silence and the disagreement among the federal circuits, we cannot say that the precedent existing on March 30, 1981, would have compelled the California Supreme Court to find that Veganes's conduct constituted state action. *See Beard v. Banks*, 542 U.S. 406, 411 (2004). Therefore, *Teague* precludes applying such a rule in this case. *Id.* at 411.[14]

**[18]** On appeal, Jackson does not argue that Veganes's racist statements constituted ineffective assistance of counsel and has failed to properly raise any such claim. In the district court, Claim 5 of Jackson's habeas petition, which was certified for this appeal, was entitled "Trial counsel provided ineffective assistance of counsel and deprived petitioner of a fair

---

[14]Neither of *Teague*'s exceptions is applicable here. A rule that certain acts of state-appointed counsel constituted state action would not "forbid[ ] punishment of certain primary conduct [n]or . . . prohibit[ ] a certain category of punishment for a class of defendants because of their status or offense." *Beard*, 542 U.S. at 416 (internal quotation marks omitted). Neither would such a rule fall within the "extremely narrow" class of "watershed rules of criminal procedure." *Schriro v. Summerlin*, 542 U.S. 348, 352 (2004). To fit within that exception, "the rule must be one 'without which the likelihood of an accurate conviction is seriously diminished.' " *Id.* Here, any act that a state-appointed counsel could commit that would rise to the level of a due process violation would likely also implicate the Sixth Amendment right to counsel; therefore, we cannot say that the lack of this alternative remedy would seriously diminish the likelihood of an accurate conviction.

trial by repeatedly making racially derogatory remarks to the jury about petitioner and his African-American ethnicity." However, the claim itself makes the same due process argument Jackson makes before us, without any reference to *Strickland*'s two-pronged framework. Because Jackson has failed to properly raise an ineffective assistance of counsel claim, we may not reach its merits.

## B. *Forced Jail Attire*

Jackson wore jail clothes throughout the trial, and Veganes repeatedly pointed out his attire during both voir dire and his closing arguments. Jackson claims that his family asked Veganes on his behalf to help obtain civilian clothing for the trial and that Veganes failed to help them. Jackson asserts that this failure violated his due process rights. The district court rejected the claim, finding that "[c]ounsel's decision to have petitioner wear prison clothing was harmless because the jury already knew Petitioner was in custody."

"[T]he State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes . . . ." *Estelle v. Williams*, 425 U.S. 501, 512 (1976). However, the Court in *Estelle* held that "the failure to make an objection to the court as to being tried in such clothes, *for whatever reason*, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." *Id.* at 512-13 (emphasis added). Jackson concedes that Veganes did not object to the jail clothing; indeed, the district court appears to have found that it was counsel's decision to dress him in such a manner. Nevertheless, Jackson argues that an objection should not be required when a court-appointed defense attorney forces a defendant to wear jail clothing against his will. In such a scenario, Jackson claims, it is the attorney, acting as a representative of the state, that provides the impermissible state compulsion, and the due process violation cannot depend on the agent of the compulsion objecting to his own actions.

**[19]** Again, Jackson's argument requires us to first find that Veganes's acts constituted state action under the Fourteenth Amendment. The State reiterates, and we agree, that *Teague* prohibits applying such a rule retroactively to Jackson's case. For the same reasons described above, when Jackson's case became final on March 30, 1981, existing precedent would not have compelled the California Supreme Court to hold that a court-appointed defense counsel's refusal to assist a client in obtaining civilian clothes constituted state action sufficient to establish a due process violation. *See Polk County v. Dodson*, 454 U.S. 312, 317 n.4 (1981) (describing how the circuits were split over the issue of whether public defenders acted under color of state law). Therefore, *Teague* prohibits us from applying such a rule in this case, and Jackson's failure to object to his jail clothing prevents him from claiming state compulsion on appeal.

## C.   *Evidence of Ott's Sexual Assault*

Jackson argues that evidence of Ott's sexual assault was improperly admitted and was so prejudicial that it denied him his right to a fair trial. Moreover, he argues that his attorney's failure to object to this evidence constituted ineffective assistance of counsel.

At Jackson's trial, evidence of the sexual assault first arose during the prosecution's redirect of one of the first police officers to view Ott's body. The prosecutor asked the officer about a bottle he found in Ott's room and asked whether the officer saw any material on the bottle. Jackson's attorney, Veganes, objected and was called to side bar:

> My objection is based on 352 of the Evidence Code on the basis that this question is calling for probative material that is irrelevant in this case, because . . . it would be highly prejudicial to describe any hairs or any potential finding of semen at the scene, because the reports are all negative in that regard. So to ask

questions just leaves speculation on the part of the jury, so that they can speculate and make this a more heinous thing than it already is . . . .

Veganes also argued that any evidence of Ott's vaginal injuries would be highly prejudicial and would be irrelevant as it was not the cause of death. The trial court apparently agreed:

> Well, it may have some relevancy to the penalty phase, but I have some misgivings about its prejudicial aspect at this phase of the trial; that is, this was not the cause of death. It does not establish the burglary. It is highly inflammatory and it seems to me, unless the bottle were used as an instrument to cause death, that—its prejudicial aspects outweigh its probative value at this time.

Despite this initial ruling, the court later allowed several witnesses to testify about Ott's sexual assault. The day after the ruling, the prosecutor asked a medical examiner to describe Ott's injuries. Veganes objected that "to sit and name every injury that is potentially found by this witness is really irrelevant and inflammatory and far exceeds the probative value." The trial court overruled the objection, and the examiner testified to all of Ott's injuries, including those to her vagina. Veganes did not make any other specific objections. Similarly, both jailhouse informants elaborated in their testimony about the sexual assault. Mikles claimed that Jackson told him "that he was so hot at her that there was a bottle on the stand next to the bed and he took the bottle and he fucked her in her pussy with it, his exact words he told me." McFarland testified that Jackson said he had "seen a wine bottle or a long-necked bottle of some kind and stuck it into her vagina." Veganes failed to object to either of the witnesses' statements.

Jackson claims that this evidence should not have been admitted and was so prejudicial that it violated his due pro-

cess rights. Even if the state court admitted the evidence in error, "we cannot disturb the state trial court's admission of [evidence] on due process grounds in a habeas proceeding unless the admission . . . rendered the trial fundamentally unfair." *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1466 (9th Cir. 1986). Jackson also argues that his attorney's failure to object to the evidence was ineffective assistance of counsel. Jackson must prove that his counsel's performance was deficient and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984).

Assuming, without deciding, that this evidence was admitted in error, it did not render Jackson's trial fundamentally unfair with respect to his convictions. Similarly, even if Veganes's failure to object was deficient, we cannot find that, but for his errors, there is a reasonable probability that the jury would not have still convicted Jackson of first-degree murder and burglary.

**[20]** The evidence of Jackson's guilt was overwhelming. Jackson confessed to all of the elements of felony murder. His confession was corroborated both by forensic evidence placing him at the scene of the crime and by the admissible testimony of several other witnesses. The evidence of Ott's sexual assault might well have been prejudicial as to the special circumstances findings, which required finding that Jackson acted with the intent to cause death, but it is extremely unlikely to have prejudiced the underlying convictions. There is no evidence that the introduction of this evidence "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (internal quotation marks omitted). As a result, Jackson is not entitled to habeas relief on this ground.

## D.  *Right to Confrontation*

Nor do we agree that the introduction at trial of preliminary hearing testimony from Debria Lewis and Larry Rushing vio-

lated Jackson's constitutional right to confrontation. The Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." U.S. Const. amend. VI. Nevertheless, the prosecution may introduce the prior testimony of a witness without running afoul of the Sixth Amendment, as long as two criteria are met: "First, the prosecutor must prove that the witness is unavailable to testify at trial. Second, the defendant must have had the opportunity to cross-examine the witness at the prior hearing." *Windham v. Merkle*, 163 F.3d 1092, 1102 (9th Cir. 1998); *see also United States v. Inadi*, 475 U.S. 387, 392-94 (1986); *Ohio v. Roberts*, 448 U.S. 56 (1980). A witness will be deemed "unavailable" only if "the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Barber v. Page*, 390 U.S. 719, 724-25 (1968). "We review de novo whether the Supreme Court's standards for unavailability have been met." *Windham*, 163 F.3d at 1102. In this case, Jackson had an opportunity to cross-examine both Rushing and Lewis at the preliminary hearing, so the only question is whether the State made "a good-faith effort" to procure their appearance at trial.

An investigator, Herman Roethel, testified on December 21, 1978, about his efforts to locate both witnesses. Roethel testified that on August 16, he was informed that the subpoenas sent to both Rushing and Lewis had been returned in the mail. Roethel visited Lewis's apartment but discovered it was vacant. He managed to contact her husband, who told Roethel that he had not seen his wife in some time but would instruct her to contact Roethel if he did. On September 29, Roethel followed up with her husband, who told him that Lewis was in custody awaiting a child custody hearing. While Lewis was in custody, Roethel personally served her with notice to appear in court on October 3; however, Jackson's trial was subsequently continued. Soon thereafter, the authorities learned that Lewis had several outstanding warrants under different aliases, so they held her in custody until October 20 for a prostitution charge. However, Roethel only learned of

Lewis's aliases and prostitution after she had been released on bail, at which point he "lost touch with her." From then until December, Roethel repeatedly checked a system to see whether Lewis had been arrested under any of her aliases. Finally, Roethel contacted one of Lewis's friends, who indicated that she had been operating as a prostitute on a particular street corner. Roethel visited the corner several times, but was not able to locate her.

Roethel also testified about his attempts to locate Larry Rushing. Roethel first visited Rushing's parents' home. His sister told him that Rushing occasionally came by the house, so Roethel left a business card with her and instructed her to have Rushing contact him. Roethel called the house over the next few weeks, and Rushing's sister told him that she had given Rushing the card. On August 29, Roethel contacted an officer named Woodward at the L.A.P.D. who had been in contact with Rushing and who volunteered to contact him again. Roethel took no further action until December 21, when he returned to the parents' house to let them know Rushing would be needed the following week for trial; they said they would likely see Rushing over the holidays. Roethel again contacted Officer Woodward, who claimed that he had not had time to contact Rushing but that he would do so. On December 28, Woodward said he had still not had time and informed Roethel that Rushing was wanted on a warrant. Roethel then contacted Rushing's probation officer who confirmed Rushing's pending warrant and said that he had not reported in since June. Finally, Roethel obtained an address for Rushing and visited it several times but he was never there.

The trial court held that the investigator had made a reasonable, good-faith effort to secure the witnesses' presence and allowed the State to introduce the preliminary hearing testimony:

> I believe that the test is one of reasonable efforts to secure the attendance of the witness, and in mak-

ing an evaluation of the efforts in this case, I am forced to consider the life-style of the people that the process server was seeking to serve.

[Rushing] apparently is a fugitive from justice and the only inference I can get from the testimony is that he is hiding out. [Lewis] is apparently a prostitute, at least part-time prostitute, who goes by many aliases and would be extremely difficult to locate if, in fact, she didn't want to be located. I expect reasonable efforts to include the things the process server did in this case. I don't think you can ask him to perform superhuman efforts to locate witnesses such as these, and I think, under the circumstances, that he did make a diligent effort to serve them with subpoenas. Therefore, I will permit you to read the testimony of the two witnesses from the preliminary hearing.

The district court agreed with the state trial court's finding and therefore denied Jackson's claim for habeas relief: "Petitioner had an opportunity to cross-examine Lewis and Rushing at the preliminary hearing, and after making a good faith effort to secure their attendance at trial, the prosecution sufficiently established their unavailability."

We agree under the circumstances that the prosecution made a good-faith effort to procure Lewis's appearance. Roethel personally served Lewis while she was in custody, and she apparently would have been present to testify had the trial not been continued (Lewis remained in custody on the date of her originally scheduled appearance). After Lewis was released, Roethel repeatedly checked to see if Lewis had been booked under any of her aliases. Finally, once Roethel learned of the street corner where she was allegedly working, he repeatedly visited the corner to no avail. In light of Lewis's transience and the shifting trial dates, Roethel's efforts were reasonable.

In contrast, we find that Roethel's efforts to procure Rushing's appearance were insufficient to meet the unavailability requirement of the Confrontation Clause. The Sixth Amendment requires "good-faith efforts undertaken *prior to trial* to locate and present th[e] witness." *Ohio v. Roberts*, 448 U.S. 56, 74 (1980) (emphasis added). At the time of Jackson's trial, California similarly recognized that the state was "required to show . . . due diligence in attempting to locate [the witness] within a reasonable time *before trial*." *People v. Benjamin*, 3 Cal. App. 3d 687, 696 (1970) (emphasis added). Yet Roethel testified that he did absolutely *nothing* to locate Rushing between August 29 and December 21, several weeks into the trial. Instead, he relied exclusively on Officer Woodward to contact Rushing. During this time period, Woodward apparently made no effort to contact the witness because he was "too busy and he hadn't had really any time to check it out." Woodward's occupation with other matters cannot excuse the prosecution from the Sixth Amendment's requirement of good-faith efforts. Moreover, it is irrelevant whether Roethel reasonably relied on Officer Woodward; Woodward was himself a state agent and was therefore no less responsible than Roethel for performing good-faith efforts to find Rushing.

**[21]** Although the admission of Rushing's preliminary hearing testimony violated Jackson's right to confrontation, we cannot grant habeas relief unless the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (1993) (internal quotation marks omitted). Rushing's testimony did not have such an effect on the jury's guilty verdicts. Rushing testified that Jackson said he had "hit" an "old lady" during a burglary and that he was going to "get the TV from next door." This is certainly incriminating testimony, but it added little to Jackson's confession, which included both of those facts. Indeed, Jackson's defense attorney himself urged the trial court to exclude Rushing's testimony as "cumulative." The testimony likely

had at most a negligible effect on the jury's verdict, so it must be considered harmless error under *Brecht*.

### E.   *Cumulative Effect*

Finally, Jackson argues that the cumulative effect of the constitutional errors in his case denied him a fair trial. "Cumulative error applies where, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors has still prejudiced a defendant." *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000) (internal quotation marks and alterations omitted). We must ask whether the aggregated errors " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

The prosecution violated *Brady* by failing to disclose inducements provided to both Mikles and McFarland, and it violated *Napue* by allowing these witnesses to present false testimony about these inducements. We assume, without deciding, that the trial court erred in allowing evidence of Ott's sexual assault to be presented. Finally, the admission of Rushing's preliminary hearing testimony violated Jackson's right to confrontation.

**[22]** We conclude that Jackson was not deprived of a fair trial as to his convictions. Even if the prosecution had entirely withheld Mikles's and McFarland's live testimony, Rushing's recorded testimony, and any testimony describing Ott's sexual assault, it seems highly unlikely that the jury would have acquitted Jackson of the felony-murders and the burglaries. As described above, much of this testimony was crucial to the special circumstances finding that Jackson committed the crime "with the intent to cause death"; however, Jackson's confession, the forensic evidence placing him at the scene of the crime, and the supporting testimony of Debra Hall

together provided overwhelming evidence of Jackson's guilt. Therefore, we find that the errors in Jackson's case did not so infect his trial with unfairness as to require reversal of his conviction.

## V.   CONCLUSION

For the foregoing reasons, the judgment of the district court is

**AFFIRMED**.