**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**
No. 96-2806

| | | |
|---|---|---|
| Bobby Ray Fretwell, | * | |
| | * | |
| Petitioner - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| Larry Norris, Director, Arkansas | * | |
| Department of Corrections, | * | |
| | * | |
| Respondent - Appellant. | * | |

_____

Submitted: September 11, 1997
Filed: January 7, 1998

_____

Before FAGG, WOLLMAN, and LOKEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

The State of Arkansas appeals the grant of federal habeas relief setting aside Bobby Ray Fretwell's death sentence. The State raises a single issue, whether the district court erred in concluding that Fretwell's trial counsel provided ineffective assistance at the penalty phase by not investigating and presenting testimony by Fretwell's mother and siblings concerning the physical and mental abuse Fretwell suffered at the hands of his father as a child. Concluding that counsel's performance did not fall below the standard of constitutional reasonableness articulated in Strickland v. Washington, 466 U.S. 668, 687-91 (1984), we reverse.

# I. Procedural Background.

In August 1985, a jury convicted Fretwell of capital murder for shooting Sherman Sullins during an armed robbery. After trial of the penalty issue, the jury sentenced Fretwell to death, finding no mitigating factors and one aggravating factor, murder for pecuniary gain. See ARK. CODE ANN. § 5-4-604(6) (Michie 1995). The Arkansas Supreme Court affirmed, Fretwell v. State, 708 S.W.2d 630 (1986), and later rejected Fretwell's petition for post-conviction relief. Regarding the issue now before us, the Court explained:

> Although petitioner states that family members were available to testify and he states that he was not aware that he would take the stand until after the trial began, he does not state what the family members' testimony would have been or how his testimony would have been different if he had known in advance that he would be called to testify. When a petitioner fails to provide a summary of the testimony which could have been given and does not explain why the testimony was important, there is no basis for a finding that counsel was ineffective.

Fretwell v. State, 728 S.W.2d 180, 183 (1987).

In 1987, Fretwell filed this petition for federal habeas relief. After lengthy delays, the district court denied Fretwell's challenge to the guilt phase of his trial, granted sentencing relief on another ground, and did not reach the ineffective assistance issue now before us. Lockhart v. Fretwell, 739 F. Supp. 1334, 1337 (E.D. Ark. 1990). A divided panel of this court affirmed, Fretwell v. Lockhart, 946 F.2d 571 (8th Cir. 1991), but the Supreme Court reversed, Lockhart v. Fretwell, 506 U.S. 364, 366 (1993), and we remanded to the district court for consideration of unresolved issues.

-2-

On remand, the district court held an evidentiary hearing, which gave Fretwell an opportunity to cure his factual default in state court.[1] Fretwell and his mother, sister, and two brothers testified to appalling physical and mental abuse inflicted upon Fretwell as a child by his father, who died after Fretwell's trial but before this hearing. Family members also testified that they would have risked the father's wrath by testifying to this abuse had counsel called them as witnesses during the penalty phase of the trial. The district court granted relief on this ground, concluding that Fretwell's trial counsel provided constitutionally ineffective assistance during the penalty phase by not interviewing these family members and then presenting their graphic testimony of abuse to the jury. The court acknowledged that counsel presented this mitigating circumstance through testimony by Fretwell and a defense expert, psychologist Douglas Stevens. However, the court concluded that counsel's deficient performance was prejudicial because Fretwell's testimony was presented without adequate preparation and Dr. Stevens's testimony "was not as compelling as it should have been."

The State appeals, arguing that Fretwell failed to satisfy either prong of Strickland's ineffective assistance standard -- constitutionally deficient performance and prejudice. Fretwell has cross-appealed, challenging the district court's denial of relief on his other unresolved claims. Another panel of this court denied Fretwell a certificate of appealability on his cross appeal. Fretwell v. Norris, No. 96-3193 (8th Cir. Dec. 31, 1997). Thus, we consider only the State's appeal. The actions of both panels result in a remand with directions to deny Fretwell's petition for habeas relief.

---

[1]Fretwell procedurally defaulted this claim when he failed to allege in his state post-conviction proceeding what testimony the additional family witnesses might have provided. See Bolder v. Armontrout, 921 F.2d 1359, 1363 (8th Cir. 1990), cert. denied, 502 U.S. 850 (1991). The district court erred in holding a hearing on the claim absent a showing of cause and prejudice excusing the default. See Keeney v. Tamayo-Reyes, 504 U.S. 1, 11-12 (1992); Zeitvogel v. Delo, 84 F.3d 276, 279 (8th Cir.), cert. denied, 117 S. Ct. 368 (1996). However, the State did not preserve this issue.

## II. Framing the Ineffective Assistance Inquiry.

We will address only <u>Strickland</u>'s first prong, whether trial counsel performed so deficiently "that counsel was not functioning as the 'counsel' guaranteed [Fretwell] by the Sixth Amendment." 466 U.S. at 687.[2] In addressing that question,

> "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."

466 U.S. at 689 (citations omitted). The district court lost sight of this critical admonition, which is perhaps not surprising given the way the evidentiary hearing progressed. Fretwell first presented his side of the ineffective assistance question but did not call trial counsel as a witness. The State called counsel as its only witness. The trial had taken place nine years earlier, and counsel's files were later destroyed in a flood. Yet counsel testified at the hearing without reviewing the extensive state court record, which is part of our record on appeal. Because he was unprepared, counsel was unable to explain, or even recall, the reasons underlying much of his performance before and during trial. The district court repeatedly used counsel's inability to recall

---

[2]Our conclusion that counsel's performance was not constitutionally deficient means that we need not address <u>Strickland</u>'s prejudice prong. However, we note that, after applying the correct standard in finding no prejudice at the guilt phase -- "defendant must show that there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been diffferent," 466 U.S. at 694 -- the district court adopted a different standard in finding prejudice at the penalty phase -- "I can comfortably say that I think there is a *significant possibility* that it would have been different with a good, robust defense or even a reasonably adequate defense at the penalty phase." This was error.

as establishing lack of competent performance. This violates the presumption that attorneys perform reasonably:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

Strickland, 466 U.S. at 689; see Brant v. Nix, 58 F.3d 346 (8th Cir. 1995). To nullify the distorting effects of hindsight, and to give this presumption its full weight, we will examine counsel's trial tactics and strategy as revealed by the state court record because that record best reflects "counsel's perspective at the time."

## III. The Crime and the Trial.

Fretwell, his wife, and a third accomplice left Springtown, Texas, in a stolen truck on April 27, 1985. They stole a pistol and shells at a filling station in Texas and a second truck in Clinton, Arkansas. When that truck broke down on April 28 in Marshall, a town in northern Arkansas, the trio discussed robbing and killing a filling station attendant. Fretwell awoke early the next morning. The filling station was closed, so he approached the home of Sherman Sullins, where a truck was parked in the driveway. Fretwell knocked on the door and asked the unsuspecting Sullins for assistance. Sullins invited him in. Fretwell drew his pistol, robbed Sullins of his money and truck keys, and knocked the elderly Sullins down with a blow to the head.

When Sullins arose, Fretwell shot him in the head at close range. The three bandits fled in Sullins's truck, continuing their crime spree until arrested in Wyoming in early May.

When arrested, Fretwell was in possession of the pistol and Sullins's truck. While in Wyoming, he gave two taped confessions to the Sullins murder. The first interview was conducted by a Wyoming county attorney, the second by a sergeant with the Arkansas State Police. Facing capital murder charges, Fretwell's two accomplices offered to testify against him at his trial.

Counsel was appointed after Fretwell made the two confessions, waived extradition to Arkansas, was charged with capital murder, and faced a trial in Sullins's home town. Counsel first entered a plea of not guilty by reason of insanity. That defense was abandoned when both the state hospital and Dr. Stevens examined Fretwell and opined that he was competent at the time of the murder. Counsel then moved to suppress Fretwell's confessions on the ground that Fretwell had not knowingly waived his Miranda rights. The court deferred ruling on that motion until the eve of trial, when Wyoming law enforcers would be available to testify at a suppression hearing. Correctly perceiving that the motion would not succeed, counsel persuaded Fretwell that he should tender a plea of guilty to the court, because under Arkansas law such a plea, if accepted, spares a defendant from the death penalty.[3]

The problem with counsel's plea strategy was that Arkansas law requires prosecutor consent to such a plea. Fretwell's prosecutor would not agree because he

---

[3]We know that counsel urged this change of plea, and that Fretwell agreed to the strategy, because counsel had client plea conferences transcribed and placed in the state court record. The district court disparaged this practice, stating counsel "seemed more concerned with protecting his own record." We do not think that is a fair reading of these transcripts, and we certainly give more weight to the tactics and strategies these contemporaneous conferences reveal than to the inferences the court drew from counsel's inability to recall the details of his performance nine years later.

was seeking the death penalty. Defense counsel nonetheless persisted, first tendering a guilty plea that the trial court refused; then offering to stipulate away the guilt phase of the trial, which the prosecutor and court also refused; and finally raising the issue unsuccessfully on appeal to the Arkansas Supreme Court. See Fretwell, 708 S.W.2d at 631-32. The district court criticized counsel for not knowing his position was contrary to law, but the transcribed client conferences reveal that counsel was fully aware that the prosecutor would object to the guilty plea and likely prevail on that legal issue. Unlike the district court, we view this as a creative attempt to avoid the risk of the death penalty in a case where conviction of capital murder was virtually certain.

In pursuing these pretrial strategies, counsel obtained the services of Dr. Stevens concerning insanity, possible mitigating circumstances, and suppression issues. Counsel also recognized that jury selection would be very important in this death penalty case. During a pretrial hearing after the guilty plea had been rejected, counsel asked the court to order compliance with a local rule that potential jurors complete written questionnaires. Counsel explained, "perhaps the only strategy the defense has at this point is in jury selection."

At the start of the trial, the motion to suppress Fretwell's confessions was denied after a hearing. Counsel again tendered a guilty plea, seeking to avoid the guilt phase of the trial. The court denied that motion, ruling that the prosecution was entitled to put on its evidence of the crime. The jury then heard thirteen prosecution witnesses describe the ruthless murder, plus the tapes of Fretwell's confessions.

Fretwell was the only defense witness at the guilt phase of the trial. On direct examination, he admitted killing Sullins during the robbery because "I was just scared, didn't know what I was doing." He testified that he had only one prior criminal conviction, that he voluntarily confessed shortly after his arrest in Wyoming, and that he waived extradition and returned to Arkansas to stand trial. Then came cross examination that, in the district court's view, "sealed [Fretwell's] fate both in the guilt

phase and the penalty phase." We agree that the prosecutor's cross examination was powerful, ending with the following exchange:

Q: All right. So you went up to Mr. Sullins' door and knocked on it and asked him for some help?

A: Yes, sir.

Q: And Mr. Sullins offered you assistance and help and let you into his home, didn't he?

A: Yes, sir.

Q: And in a matter of a few minutes you robbed him of all the money he had on him, robbed him of the keys to his pickup truck and shot him in the head at a distance of about three feet or less, didn't you?

A: Yes, sir.

* * * * *

Q: You showed Mr. Sullins absolutely no mercy, did you?

A: I guess not.

* * * * *

Q: Give me one valid reason why this jury should show you any more mercy than you showed Mr. Sullins?

A: I don't know, sir.

[THE PROSECUTOR]: That's what I thought.

After quoting at length from this cross exam, the district court concluded:

-8-

I simply can't find . . . that he should have been put on the stand if he was going to so testify. . . . That cannot have been the result of any kind of reasonable, any minimally reasonable trial strategy.

But this conclusion ignores trial realities. With insanity unprovable and the motion to suppress denied, Fretwell's conviction was virtually certain. Thus, defense counsel wisely focused his trial strategy on avoiding the death penalty, and his questioning plainly reveals that Fretwell's testimony during the guilt phase was in fact the beginning of counsel's penalty phase defense. Was it constitutionally unreasonable to put his client on the stand? We think not. Fretwell was not a remorseless braggart, like the defendant reasonably kept off the witness stand in Burger v. Kemp, 483 U.S. 776, 791-92 (1987). Rather, Fretwell was, to quote the later testimony of Dr. Stevens, a "whipped puppy" who might succeed in attracting some sympathy from at least one juror in the penalty phase. The points made during Fretwell's direct exam were designed to portray him as a killer not deserving of the ultimate penalty -- he planned only to rob Sullins and shot him out of fear and confusion; he did not have a lengthy criminal history; and he cooperated fully with the authorities after his arrest. The prosecutor, aware that Fretwell might not be recalled during the penalty phase, also aimed his examination at the penalty issue. In hindsight, the cross exam was obviously effective with the jury. But that does not mean counsel was ineffective for putting his client on the stand. The alternative strategy -- to argue for a life sentence to a jury that has heard Fretwell's taped confessions but has not heard him ask for mercy at the trial -- was surely no more likely to succeed.

When the penalty phase began, the prosecution called no additional witnesses. The defense called two witnesses, Fretwell and the defense expert, Dr. Stevens. Fretwell briefly recalled his troubled childhood for the jury:

Q: How did your parents treat you?

A: Well, my dad beat me and everything else.

Q: You had pretty bad problems of abuse?

A: Yeah.

Q: Did you relate your experiences to a Dr. Doug Stevens?

A: Yeah.

\* \* \* \* \*

Q: Are your parents in the courtroom now?

A: Yeah.

Q: Make it difficult for you to talk about this?

A: (No verbal response.)

Q: Nevertheless, it is necessary for you to talk about it. . . . [W]hat were some of the worst experiences you had to suffer as a child?

A: Well, just getting beat with boards or other crap.

Q: Was this something that happened all the time?

A: Uh, the biggest part of the time.

Q: But you did go ahead and go into detail with the psychologist about this; is that right?

A: Yes.

The defense then called Dr. Stevens, who testified in greater detail concerning Fretwell's unfortunate childhood:

In going back into his early history when I started asking him about his family background, he became upset also and indicated that he had been physically and emotionally abused by his father . . . . He indicated that his dad was a disabled iron worker who was an alcoholic and physically abused the kids, beat them, sometimes for reasons, sometimes for no reason. When the mother tried to intervene and protect her children, he would beat her, too.

Bobby indicated that he was terrified of his father in growing up and that he remains terrified of him. Uh, he indicated that his father always wanted him to be the macho type of individual, which he wasn't. That in school when the other kids would pick on him, if he didn't fight back when he'd get home his father would make him go out in the front yard and fight with the brother that he cared a great deal about; the two brothers were very close.

[The father] would make the boys put on girls' dresses and wear them as evidence of their sissyness simply because they wouldn't fight at the drop of a hat.

In the penalty phase closing argument, counsel argued that the prosecution had not proved an aggravating circumstance because the circumstances were inherent in the crime of armed robbery and murder, and that Fretwell deserved a life sentence because he cooperated with the authorities and confessed.

### IV. The Ineffective Assistance Question.

The district court concluded that Fretwell's attorney was ineffective in failing to investigate what other members of Fretwell's immediate family might have known about his father's pervasive child abuse. We disagree. Like defense counsel in Burger v. Kemp, 483 U.S. at 790, Fretwell's attorney was "aware of some, but not all, of this family history." At counsel's request, the court appointed Dr. Stevens as defense expert. His pretrial report to counsel disclosed the same childhood abuse summarized

in his above-quoted trial testimony.  Counsel also discussed the issue with Fretwell, who was reluctant to talk about it and never suggested that counsel discuss it with other family members.  Finally, although Fretwell's mother testified at the habeas hearing that she had no contact with defense counsel until she came to the trial, the attorney-client conference transcripts reveal that Fretwell and his counsel were in frequent contact with both parents prior to trial, discussing subjects such as whether to hire another psychiatrist to investigate Fretwell's competency, whether the parents would testify that Fretwell was insane, and whether Fretwell should tender a plea of guilty to the court. In these circumstances, we cannot conclude that counsel's investigation of the issue was constitutionally defective.  As the Supreme Court said in Strickland:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.  In particular, what investigation decisions are reasonable depends critically on such information.  For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.

466 U.S. at 691; see LaRette v. Delo, 44 F.3d 681, 685-86 (8th Cir.), cert. denied sub nom. LaRette v. Bowersox, 116 S. Ct. 246 (1995); Battle v. Delo, 19 F.3d 1547, 1555 (8th Cir. 1994), cert. denied sub nom. Battle v. Bowersox, 116 S. Ct. 1881 (1996); Whitmore v. Lockhart, 8 F.3d 614, 618-22 (8th Cir. 1993).  This is not a case where "counsel failed to make *any* investigation whatsoever" resulting in a "total abdication of duty."  Pickens v. Lockhart, 714 F.2d 1455, 1467 (8th Cir. 1983).  Counsel's decision not to "mount an all-out investigation into petitioner's background in search of mitigating circumstances was supported by reasonable professional judgement." Burger, 483 U.S. at 794; see Laws v. Armontrout, 863 F.2d 1377, 1387 (8th Cir. 1988) (en banc), cert. denied, 490 U.S. 1040 (1989).

The district court further concluded that counsel provided constitutionally ineffective assistance in failing to call Fretwell's mother, brothers, and sister to testify as to the abuse he suffered as a child. The decision to call family members as witnesses is a "strategic decision." Guinan v. Armontrout, 909 F.2d 1224, 1231 (8th Cir. 1990), cert. denied, 498 U.S. 1074 (1991). Thus, Fretwell must "overcome a strong presumption that his counsel's actions constituted reasonable trial strategy." Snell v. Lockhart,14 F.3d 1289, 1301 (8th Cir.), cert. denied sub nom. Snell v. Norris, 513 U.S. 960 (1994). "Decisions relating to witness selection are normally left to counsel's judgment, and 'this judgment will not be second-guessed by hindsight.'" Williams v. Armontrout, 912 F.2d 924, 934 (8th Cir. 1990) (en banc) (quotation omitted), cert. denied, 498 U.S. 1127 (1991).

The record on this issue is unsatisfactory because, at the habeas hearing nine years after Fretwell's trial, all counsel could recall was, "I probably didn't see that there was anything to be gained by putting family members on." However, recognizing the strong presumption of reasonable trial strategy, we can readily reconstruct at least two strategic reasons why counsel may have made this decision. First, Fretwell and the family were reluctant to discuss the issue of abuse, and the abuser, Fretwell's father, was alive and attending the trial. Even assuming, as the district court did, that Fretwell's mother and siblings would have risked the father's wrath by testifying as they did at the habeas hearing, counsel could reasonably fear that there might be dramatic and negative consequences if he called other family members to testify on this subject. As the Supreme Court observed in Burger v. Kemp, 483 U.S. at 793, graphic evidence of a defendant's violent and troubled family background is "by no means uniformly helpful."

The second strategic reason is perhaps more significant. Counsel did present evidence about Fretwell's abusive childhood, the testimony of Fretwell and Dr.

-13-

Stevens.[4]  Though counsel gave this potentially mitigating information to the jury, he elected to focus in closing argument on two factors more directly related to Fretwell's crime, whether the prosecution had proved an aggravating circumstance, and Fretwell's post-arrest cooperation and confessions.  Counsel could reasonably fear that too many witnesses on Fretwell's family background would distract the jury from the issues that counsel believed were more likely to avoid the death penalty.  In evaluating ineffective assistance claims, "[w]e address not what is prudent or appropriate, but only what is constitutionally compelled." Laws, 863 F.2d at 1384.  Decisions to introduce only some of the available evidence on a point do not, unless "deficient in some significant respect," fail the first prong of Strickland.  Smith v. Armontrout, 888 F.2d 530, 535 (8th Cir. 1989).  There was no significant deficiency here.

Fretwell has not demonstrated that the challenged actions of his trial attorney "were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690.  Accordingly, the judgment of the District Court is reversed, and the case is remanded with directions to enter judgment denying Fretwell's petition for a writ of habeas corpus.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[4]That distinguishes this case from Kenley v. Armontrout, 937 F.2d 1298, 1309 (8th Cir.), cert denied sub nom. Delo v. Kenley, 502 U.S. 964 (1991; Woodard v. Sargent, 806 F.2d 153, 158 (8th Cir. 1986); and Pickens, 714 F.2d at 1467, where counsel totally failed to gather and present evidence on a mitigating circumstance.